O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF MASSIMILIANO LANZANI, <br><br> A fugitive from the Government of Spain. | Case No. CV 09-07166-GAF (MLG) <br><br> MEMORANDUM OPINION AND ORDER DENYING REQUEST FOR CERTIFICATION FOR EXTRADITION |

Before the Court is a request for extradition under 18 U.S.C. § 3184 brought by the Government of Spain against Massimiliano Lanzani. Spain seeks the extradition of Lanzani for his alleged participation in a tax fraud scheme involving nonpayment of value added taxes (VAT). Pursuant to the extradition treaty between the United States and Spain, the United States acts on behalf of Spain in this matter. *See* Extradition Treaty Between the United States of America and Spain, Mar. 29, 1970, art. 17, T.I.A.S. No. 7136.

**I. Procedural Background**

On August 11, 2009, Massimiliano Lanzani, a citizen of Italy, was arrested in this district pursuant to a provisional arrest

warrant issued by Magistrate Judge Paul L. Abrams. On August 12, Lanzani appeared before the Honorable Carla Woehrle, United States Magistrate Judge, who continued Lanzani's detention hearing to August 17, 2009. At the conclusion of the August 17 hearing, Magistrate Judge Woehrle continued the detention hearing to August 25, 2009 and invited the parties to file supplemental briefing. At the August 25 hearing, Magistrate Judge Woehrle denied Lanzani's motion for bail without prejudice.

On October 1, 2009, the United States filed a copy of Spain's formal extradition request with the Court, and the matter was assigned to United States District Judge Gary A. Feess and this United States Magistrate Judge.

On October 30, 2009, Lanzani filed a motion for revocation of the order of detention entered by Magistrate Judge Woehrle, which the United States opposed. The Court held a hearing on November 24, 2009, and denied the motion and ordered Lanzani detained pending further proceedings.

On November 5, 2009, supplemental formal extradition papers were submitted by Spain and filed by the United States. On November 5, the United States also filed its memorandum in support of extradition. On December 4, Lanzani filed his opposition to extradition. The United States filed its Reply on December 18, 2009. An extradition hearing was scheduled for January 7, but continued to January 14 at the request of the United States.

On January 12, the United States filed second supplemental extradition papers submitted by Spain. On January 13, Lanzani filed a response and opposition to the Government's filing of these papers. The parties appeared before this Court on January 14, at which time

2

Lanzani requested that the extradition hearing be continued until January 21. The Court granted the continuance. On January 20, 2010, Lanzani filed a supplemental response to the Government's second supplemental formal extradition papers.

An extradition hearing was held before this Court on January 21, 2010. Assistant United States Attorney Daniel S. Goodman appeared on Spain's behalf, and David A. Kettel and Cynthia Catalino appeared on behalf of Lanzani. Mr. Lanzani was present and testified with the aid of an interpreter. The matter was taken under submission, and the Court has carefully considered the parties' respective pleadings, evidence, testimony, and oral arguments. For the reasons discussed below, the Court issues this Memorandum and Order denying Spain's request for Lanzani's extradition.

**II.   Factual Background**[1]

    **A.   Alleged Crime**

Spain has accused Lanzani of committing Art. 305, "Crimes against the Public Treasury and the 'Welfare and Social Security' system," which provides in relevant part:

    1. Any person who through action or omission, defrauds the national, autonomous or local Treasury by evading payment of taxes, amounts retained at source or amounts that should have been retained or payments derived from remuneration in kind, obtaining fraudulent tax rebates or enjoying other

---

[1] As the Court noted at several hearings in this matter, due to the cut-and-paste nature and poor translation of the formal extradition papers, the Court was never presented with a clear description of the alleged scheme or Lanzani's involvement in it. The summary that follows represents the Court's understanding of Spain's allegations.

forms of improper fiscal benefits through the same action or omission, when the amount of the defrauded tax payable, or the amount not paid in retained taxes or the amount of the fraudulently obtained rebate or other fiscal benefit improperly enjoyed, exceeds the amount of 120.000 Euros, will be punished with a prison sentence of one to four years and a fine of up to six times said amount.

(Formal Extradition Papers ("FEP") at 75.) Specifically, Spain alleges that Lanzani participated in a scheme to defraud the treasury of VAT during the fiscal years 2006 and 2007. (FEP at 84, 91, 99, 102-04; Second Supplemental FEP at 50-60.)

The alleged scheme involved the purchase, transport, and subsequent sale of alcoholic beverages. Massimiliano Lanzani owns a company, which was known as Itamax Trading in 2006 and as Massimiliano Lanzani S.L. in 2007. (FEP at 92; Extradition Hr'g, Jan. 21, 2010.) Spain alleges that this company was fictitious, lacking any real activity or infrastructure. (FEP at 79-80.) According to Spain, Lanzani's businesses purchased alcoholic beverages within the European Community from two Spanish companies through its representative Cargonet S.L. and its administrator Jose Rodriguez Andres. (FEP at 85-87.) While the merchandise was purchased via bank transfers from a bank account under the name of Massimiliano Lanzani, Lanzani was allegedly supplied with capital for the purchases by Luis Ramon de la Torre Gordo, Jose Antonio Rodriguez Andres, the administrator of Cargonet S.L. and Cargopat S.L., and Carlos Calvo Pelayo, the chief executive officer and administrator of Cedilla S.L. (FEP at 93-94.)

Spain alleges that these beverages were placed in what are known

4

as "deposito fiscal" or "fiscal deposits" in Madrid and Gerona, Spain. (FEP at 86.)[2] Spain alleges that beginning in 2006, Lanzani and his co-conspirators would transport the beverages from a tax-free warehouse in Spain to a tax-free warehouse in Hendaya, France, claiming that the beverages would be sold in another EU country. (FEP at 86-87; Supplemental FEP at 6.) But shortly thereafter a truck would arrive to transport the beverages to a tax-free warehouse in Zamora, Spain. (FEP at 86-87.) The transport was arranged by Cargonet S.L. through its representative, Jose Antonio Rodriguez Andres, on behalf of Lanzani. (FEP at 92.) Once in Spain, the beverages might be moved among Spanish fiscal deposits. (FEP at 89, 92-93.) The trucks transporting the beverages allegedly traveled with bills of sale indicating that Lanzani was their owner and that he had been charged the VAT. (Supplemental FEP at 5-6.)[3]

Spain further alleges that Lanzani's business removed the beverages from the fiscal deposit in Spain and sold them to a Spanish company known as a "pantella." (FEP at 94-95; Supplemental FEP at 6.)[4] Spain defines a pantella as a company that participates in the scheme by buying and selling merchandise. (FEP at 90; Supplemental

---

[2] A fiscal deposit is a VAT tax-free warehouse. (Supplemental FEP at 5-6.) In Spain, all alcoholic beverages that originate from countries within the European Union are held in these warehouses. (*Id.*) When the beverages are transferred between fiscal deposits within Spain or any other EU country, the payment of VAT taxes is suspended. (*Id.*) But once the beverages are removed from a tax-free warehouse, there is an obligation to pay VAT. (*Id.*) That is, when the beverages are sold, VAT is owed to the Spanish Treasury. (*Id.*)

[3] It was never made clear to the Court how this movement of beverages among fiscal deposits furthered the alleged VAT fraud.

[4] According to Spain, Lanzani's business played the role in the scheme of a "trucha" or fictitious untraceable company. (FEP at 89; Second Supplemental FEP at 51.)

FEP at 6.) Lanzani would allegedly invoice the pantella for the VAT that he incurred upon removing the merchandise from the tax-free warehouse, but not collect the VAT or pay it to the Treasury. (FEP at 79, 90, 95, 97; Supplemental FEP at 6.)[5] The pantella would then request a refund of the VAT from the Treasury. (FEP at 90.)[6] The Treasury was then left with a claimed exemption but no VAT having been paid by Lanzani. (FEP at 90.)

Spain alleges that the merchandise was ultimately sold to a network of clients and distributors who were the "true beneficiaries of the fraud," and who then began recirculating the product. (FEP at 86, 90.) According to Spain, the additional transport and storage costs associated with shipping the goods among fiscal deposits, coupled with the low prices charged, meant that the operations would have lacked all commercial logic without the VAT fraud. (FEP at 97-98.) Spain also alleges that because the goods were ultimately billed at a price lower than their cost, Lanzani would have been unable to cover the loss and obtain a benefit without the VAT fraud. (FEP at 98.)[7]

Spain alleges that Lanzani defrauded the Spanish Treasury of 4.692.639,37 Euros in 2006 and 6.855.642,49 Euros in 2007. (Second

---

[5] Some of the materials submitted by Spain suggest that Lanzani did collect the VAT from the pantellas but never paid it to the Treasury. (*See, e.g.*, FEP at 97; Secondary Supplemental FEP at 51).

[6] Some of the materials submitted by Spain seem to indicate that Lanzani also requested VAT refunds from the Treasury. (*See, e.g.*, Supplemental FEP at 5-6.) Other materials state that the ultimate distributing companies would deduct a fictitious VAT from their income-tax returns. (FEP at 97.)

[7] Some materials indicate that Lanzani was remunerated by the final distributors in the form of money or goods (FEP at 79), while other materials suggest that he retained as payment the VAT collected from the pantellas (FEP at 97).

Supplemental FEP at 6.)[8] Moreover, because they did not charge VAT, Lanzani and his co-conspirators also allegedly caused damage to the Spanish market by undercutting the prices of law-abiding competitors. (FEP at 98; Supplemental FEP at 53, 59.)

Finally, Spain also alleges that Lanzani has a criminal record in Italy, which includes a sentence in 2005 of two months and 20 days imprisonment for VAT fraud. (FEP at 100; Second Supplemental FEP at 37, 48.)

**B.    Evidence Presented in Support of Extradition**

In support of its extradition request, Spain submitted Formal Extradition Papers, which consisted of a lengthy description of Lanzani's alleged crime signed by a Spanish investigating magistrate. (Docket No. 15.) The Papers seem to be comprised of accounts given by several investigating agencies.

Spain also submitted Supplemental Formal Extradition Papers, which consist of a two-page document on Spanish Civil Guard letterhead signed by an individual of unknown identity. (Docket No. 23.) The papers provide a brief summary of the allegations against Lanzani and explain that Spain's evidence is based on an investigation conducted over a span of several years by the judicial police, the Spanish Department of Treasury, and Customs agents. (Supplemental FEP at 5.) The papers also indicate that, as part of its investigation, law enforcement officials obtained tax reports, tax refund requests, telephone intercepts, Customs records, shipping invoices, bills of sale, law enforcement physical surveillance, and

---

[8] The Supplemental Formal Extradition Papers state that Lanzani defrauded the treasury of 6,842.49 Euros in 2007. (Supplemental FEP at 6.) The Court is unable to decipher whether this is a true discrepancy or a mere typographical error.

1  statements and interviews of various haulage contractors and
2  individuals in charge of companies involved in the alleged fraud.
3  (*Id.*)[9]

4      Finally, Spain submitted Second Supplemental Formal Extradition
5  Papers. (Docket No. 38.) These include transcripts of intercepted
6  telephone calls between Lanzani and his alleged co-conspirators in
7  2008 and 2009, two documents regarding Lanzani's arrest record in
8  Italy, and reports of Lanzani's tax audits for 2006 and 2007.

9

10 **III.  Discussion**

11     **A. Requirements for Extradition**

12      Extradition from the United States is governed by 18 U.S.C. §
13 3184, which confers jurisdiction on "any justice or judge of the
14 United States" or any authorized magistrate judge to conduct an
15 extradition hearing under the relevant extradition treaty between the
16 United States and the requesting nation.[10] The purpose of the

17 ─────────────

18      [9] With a few exceptions, Spain has not included this evidence in
   its extradition request.

19      [10] 18 U.S.C. § 3184 provides that:
20 Whenever there is a treaty or convention for extradition
   between the United States and any foreign government, or in
21 cases arising under section 3181(b), any justice or judge of
   the United States, or any magistrate judge authorized so to
22 do by a court of the United States, or any judge of a court
   of record of general jurisdiction of any State, may, upon
23 complaint made under oath, charging any person found within
   his jurisdiction, with having committed within the
24 jurisdiction of any such foreign government any of the crimes
   provided for by such treaty or convention, or provided for
25 under section 3181(b), issue his warrant for the apprehension
   of the person so charged, that he may be brought before such
26 justice, judge, or magistrate judge, to the end that the
   evidence of criminality may be heard and considered. Such
27 complaint may be filed before and such a warrant may be
   issued by a judge or magistrate judge of the United States
28 District Court for the District of Columbia if the
   whereabouts within the United States of the person charged

8

extradition hearing is to determine whether a person arrested pursuant to a complaint in the United States on behalf of a foreign government is subject to surrender to the requesting country under the terms of the pertinent treaty and relevant law. *See* 18 U.S.C. § 3184.

In order to surrender the person to the requesting country, the Court must determine that each of the following requirements have been met: (1) the extradition magistrate has jurisdiction to conduct the extradition proceedings; (2) the extradition magistrate has jurisdiction over the fugitive; (3) an extradition treaty is in full force and effect; (4) the crime is extraditable (the dual criminality requirement)[11]; (5) there is probable cause to believe that the individual appearing before the magistrate judge has committed the crimes alleged by the requesting nation; and (6) there are no applicable treaty provisions which bar the extradition for any of the

are not known or, if there is reason to believe the person will shortly enter the United States. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

[11] "[U]nder the doctrine of 'dual criminality,' an accused person can be extradited only if the conduct complained of is considered criminal by the jurisprudence or under the laws of both the requesting and requested nations." *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir. 1986). The dual criminality principle is incorporated into Article 2 of the U.S.-Spain extradition treaty, which provides that: "[a]n offense shall be an extraditable offense if it is punishable under the laws in both Contracting Parties by deprivation of liberty for a period of more than one year, or by a more severe penalty." Treaty, art. 2(A) (FEP 21).

1  charged offenses. *See Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir.
2  2000); *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1009-10 (9th Cir.
3  2000); *Quinn v. Robinson*, 783 F.2d 776, 783, 790 (9th Cir. 1986);
4  *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984).

5       If these requirements are met, the extradition magistrate must
6  certify the individual as extraditable to the Secretary of State and
7  issue a warrant of commitment. *Blaxland v. Commonwealth Dir. of Pub.*
8  *Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003). Once such a
9  certification has been made, "it is the Secretary of State,
10  representing the executive branch, who determines whether to
11  surrender the fugitive." *Id.*; 18 U.S.C. § 3184. Extradition is a
12  matter of foreign policy entirely within the discretion of the
13  executive branch, and "the executive branch's ultimate decision on
14  extradition may be based on a variety of grounds, ranging from
15  individual circumstances, to foreign policy concerns, to political
16  exigencies." *Blaxland*, 323 F.3d at 1208. Thus, the authority of the
17  extradition magistrate is limited to the judicial determination
18  required by section 3184.

19       In the present case, the parties do not dispute: the Court's
20  jurisdiction; its jurisdiction over Lanzani; the existence of an
21  extradition treaty; that the alleged crime satisfies the dual
22  criminality requirement and is extraditable; or that no treaty
23  provision expressly bars extradition for the offense. And the Court
24  similarly finds these requirements to have been met. Thus, the
25  dispositive issue before this Court is whether there is probable
26  cause to believe that Lanzani has committed the crime for which Spain
27  requests extradition.

28  //

10

1   **B.   Probable Cause**

2          Lanzani contends that this Court should deny extradition because

3   Spain has failed to present competent evidence establishing probable

4   cause that he committed the alleged crime. A probable cause

5   determination under the Extradition Treaty between Spain and the

6   United States requires "such information as would justify the

7   committal for trial of the person if the offense had been committed

8   in the requested State." (FEP at 25 (Treaty, art. 6)). This

9   requirement is met if "'there [i]s any evidence warranting the

10  finding that there was a reasonable ground to believe the accused

11  guilty." *Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir.

12  1988)(quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).

13         An extradition magistrate "does not weigh conflicting evidence

14  and make factual determinations." *Quinn*, 783 F.2d at 815. The

15  extradition proceeding "is designed only to trigger the start of

16  criminal proceedings against an accused; guilt remains to be

17  determined in the courts of the demanding country." *Valencia v.*

18  *Limbs*, 655 F.2d 195, 198 (9th Cir. 1981); *see also Bozilov v.*

19  *Seifert*, 983 F.2d 140, 143 (9th Cir. 1993) ("the magistrate need only

20  'determine whether there is competent evidence to justify holding the

21  accused to await trial, . . . not . . . whether the evidence is

22  sufficient to justify a conviction.'" (quoting *Collins v. Loisel*, 259

23  U.S. 309, 316 (1922))).

24         The Court must base a finding of probable cause on competent

25  evidence. *Collins*, 259 U.S. at 316. But the rules of evidence, other

26  than with respect to privilege, do not apply in extradition

27  proceedings. FED. R. EVID. 1100(d)(3); *see e.g.*, *Collins*, 259 U.S. at

28  317 (unsworn statements of absent witnesses may be acted upon by

11

1  extradition magistrate although they could not have been received by

2  him under the law of the state on a preliminary examination); *Emami*

3  *v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1451

4  (9th Cir. 1987) ("In the Ninth Circuit it has been repeatedly held

5  that hearsay evidence that would be inadmissable for other purposes

6  is admissible in extradition proceedings.").

7      Lanzani argues that the Court may not rely on Spain's

8  submissions to find probable cause because an extradition request

9  must be supported by an affidavit. (Def.'s Mem. in Opp'n at 6-7;

10  Def.'s Supplemental Resp. at 6-7.) The Court disagrees. First, simply

11  because Spain's materials are not in the form of sworn affidavits

12  does not render them inadmissible. Because Spain's formal papers have

13  been certified and authenticated in accordance with 18 U.S.C. § 3190[12]

14  and the U.S.-Spain Extradition Treaty[13] (FEP at 7, 47, 48; Second

15  Supplemental FEP at 5-6, 20, 30, 33, 36), they are admissible and may

16  be considered by this Court in this extradition proceeding. *Choe v.*

17  *Torres*, 525 F.3d 733, 740 (9th Cir. 2008); *Oen Yin-Choy v. Robinson*,

18  858 F.2d 1400, 1406 (9th Cir. 1988).

19      Second, evidence presented in support of extradition does not

20  necessarily lack competence merely because it is unsworn. *See, e.g.*,

21

22  [12] 18 U.S.C. § 3190 provides: "Depositions, warrants, or other
    papers or copies thereof offered in evidence upon the hearing of any
23  extradition case shall be received and admitted as evidence on such
    hearing for all the purposes of such hearing if they shall be properly
24  and legally authenticated so as to entitle them to be received for
    similar purposes by the tribunals of the foreign country from which the
25  accused party shall have escaped . . ."

26  [13] Article 10 of the Treaty provides that "documents which . . .
    shall accompany the extradition request, shall be admitted in evidence
27  when . . . they bear the signature of a judge or other juridical or
    public official and are certified by the principal diplomatic or
28  consular officer of the United States in Spain."(FEP at 43.)

*Collins*, 259 U.S. at 317 (noting that "unsworn statements of absent witnesses may be acted upon by the committing magistrate"); *Mainero v. Gregg*, 164 F.3d 1199, 1206 (9th Cir. 1999) ("[I]t is well-settled in this circuit that evidence is not incompetent simply because it is hearsay."); *Zanazanian*, 729 F.2d at 626-27 (noting that unsworn statements may be competent evidence where treaty does not require them to be made under oath).

Lanzani's reliance for this proposition on *In the Matter of Extradition of Platko*, 213 F.Supp.2d 1229 (S.D. Cal. 2002), is misplaced. First, the *Platko* court relied on *Emami* to conclude that hearsay is only admissible in extradition proceedings if it is vouched for in an affidavit. *Platko*, 213 F.Supp.2d at 1237. But *Emami* dealt with a treaty that, unlike the United States-Spain extradition treaty, required submissions to be made under oath. *See Emami*, 834 F.2d at 1451 & n.8. Second, the *Platko* court held that the phrase, "depositions . . . shall be produced" in the United States-Czechoslovakia extradition treaty meant that sworn statements were required. *Platko*, 213 F.Supp.2d at 1237-38. But, no similar phrase exists in the U.S.-Spain extradition treaty. *See also Manta v. Chertoff*, No. 06-1568, 2007 WL 951298, *3-*4 (S.D. Cal. Mar. 12, 2007)(disagreeing with the reasoning of *Platko*), *aff'd*, 518 F.3d 1134, 1147 (9th Cir. 2008) (referring to "our well-established case law that evidence offered for extradition purposes need not be made under oath").

While Spain did not need to include sworn affidavits in its extradition request, it has nonetheless failed to present competent evidence upon which the Court may find probable cause. The formal extradition papers and two-page supplemental formal extradition

13

papers, signed respectively by a Spanish investigating magistrate and a Spanish official, provide the Court with Spain's detailed allegations concerning the alleged tax fraud scheme. But the Ninth Circuit Court of Appeals has held that "accusations are not evidence" in extradition proceedings. *Choe*, 525 F.3d at 738-39 (citing *In re Sauvage*, 819 F.Supp. 896, 902-03 (S.D. Cal. 1993)) (reversing extradition magistrate's probable cause finding because extradition papers accused fugitive of bribery but did not provide any evidence of guilt); *see also In the Matter of Extradition of Lehming,* 951 F.Supp. 505, 517 (D. Del. 1996)("unsupported conclusory statements . . . are insufficient to satisfy probable cause"). Spain's papers state generally that the allegations against Lanzani are based on an investigation during which law enforcement officials obtained documents, conducted surveillance, and interviewed witnesses (Supplemental FEP at 5.), but, with a few exceptions, no source materials have been provided or summarized. Similarly, while witnesses may have been interviewed, the Court has no information regarding their identities or the nature of the information they provided.[14]

This Court's "review of the proffered evidence 'cannot be a mere ratification of the bare conclusions of others.'" *United States v. Nolan*, 651 F.Supp.2d 784, 810 (N.D. Ill. 2009) (quoting *In re Extradition of Ribaudo*, 2004 WL 213021, *5 (S.D.N.Y. Feb. 3, 2004)) (conclusory statements by Costa Rican authorities did not support

---

[14] The Court also notes that the formal extradition papers contain gaps and inconsistencies, which have made it difficult to ascertain exactly how the alleged scheme transpired. Whether this is the result of an inadequate translation or the omission of facts, the Court has never been able to ascertain how the alleged scheme was implemented.

probable cause). Rather, this Court must conduct an "independent review" of the evidence to determine whether probable cause exists. *Lehming*, 951 F.Supp. at 514; *Platko*, 213 F.Supp.2d at 1239-40.

In order "[t]o support a finding of probable cause[,]":

> an affidavit must contain factual support for the affiant's conclusions and either an assertion that the affiant speaks from personal knowledge or a statement of the sources for the affiant's belief and the circumstances from which the affiant concluded that the sources were reliable and credible.

*Sauvage*, 819 F.Supp. at 902-03. This principle also applies to cases such as this, where there is no affidavit, but rather summaries of factual allegations submitted by investigators in support of the accusations. Because Spain's formal extradition papers fail to state the sources or basis of their accusations, this Court is unable to evaluate the findings or accord them weight in the probable cause determination. *See id.* (holding that probable cause could not be based on French prosecutor's and investigating magistrate's reports, which failed to provide sources of their factual findings); *cf. Quinn*, 783 F.2d at 815 (noting that weight to be accorded in probable cause determination to testimony of witnesses "is solely within the province of the extradition magistrate").

The evidence before this Court stands in sharp contrast to that which the Ninth Circuit Court of Appeals deemed competent to support probable cause in several cases cited by the Government. *See, e.g.*, *Emami*, 834 F.2d at 1447, 1450-52 (German prosecutor's detailed summaries of statements made by fugitive's former employees and patients was competent evidence to support probable cause);

15

*Zanazanian*, 729 F.2d at 625-28 (finding detailed summaries of police interviews of suspected accomplices to be competent evidence); *Sakaguchi v. Kaulukukui*, 520 F.2d 726, 729 & n.6, 730-31 (9th Cir. 1975)("death bed" statement by victim, two signed statements implicating fugitive, and police investigation report reviewing these and other statements made by fugitive's family members deemed competent evidence). In each of these cases, the court was provided with a summary of specific sources of information regarding the crime, and these sources were identified. In contrast, the formal extradition papers filed by the Government in this case describe the alleged scheme in piecemeal fashion without summarizing or identifying the sources for Spain's theory of its case against Lanzani.

The supplemental documentation filed by the United States on behalf of Spain is also insufficient to establish probable cause. In addition to the formal extradition papers and supplemental formal extradition papers, Spain submitted: (1) two documents pertaining to Lanzani's criminal record in Italy; (2) wiretap excerpts; and (3) a report of audits of Lanzani. (*See* Second Supplemental FEP.) While these documents are of the type that might provide evidentiary support for Spain's allegations, their content does not provide sufficient evidence to support a finding of probable cause.

The Government has filed two official documents corroborating Spain's contention that Lanzani has a criminal record in Italy. (Second Supplemental FEP at 37, 48; *see also* FEP at 100.) Lanzani testified that he does not have a criminal record, and submitted a document from Brescia, Italy stating that he has no criminal record. (Extradition Hr'g, Jan. 21, 2010; Def.'s Supplemental Resp. Ex. M.)

16

The Court may not "weigh conflicting evidence and make factual determinations" in an extradition proceeding. *Quinn*, 783 F.2d at 815. Even if the Court assumes that Lanzani has a criminal record, it is but one factor to be considered. In this case, a criminal record, alone, is insufficient to support a probable cause finding.

Spain has also submitted transcripts of wiretap excerpts of telephone calls in 2008 and 2009. (Second Supplemental FEP at 6-29, 62-71.) These are calls made between the alleged co-conspirators, including Lanzani. During these calls, the parties express their awareness of the Spanish government's investigation of their companies, the payment of Lanzani's credit cards, Lanzani's need for money to pay taxes, Jose Andres' need to receive the VAT refund and Lanzani's failure to submit the required documentation, Lanzani's opening of a new bank account for a new company,"trucks," and alcohol. (*Id.*)

The Court finds that these transcripts are inconclusive and do not support a finding of probable cause that Lanzani committed tax fraud. Indeed, there is nothing in these recorded conversations which evidence Lanzani's participation in a scheme to commit tax fraud. Rather, they merely show an awareness of a continuing tax investigation and reveal a business relationship under which Jose Andres is paying for portions of Lanzani's expenses. Nothing in these tapes demonstrate that the discussions relate to a tax fraud scheme.

Finally, Spain submitted portions of tax audits, indicating the amount of Lanzani's alleged fraud for the years 2006 and 2007. (Second Supplemental FEP at 50-60.) The audits describe in general terms how the amount of VAT taxes owed by Lanzani was calculated and explain that documents were reviewed and summonses were issued to the

taxable parties. (*Id.*) Although the audits are the most compelling evidence submitted in support of extradition, they too do not support a finding of probable cause. Like the other evidence presented by the United States, the statements are conclusory, demonstrating the existence of an accusation against Lanzani, but failing to present the underlying facts supporting this accusation. This is insufficient to establish probable cause. *Choe*, 525 F.3d at 738-39

The Government relies on *Jaben v. United States*, 381 U.S. 214 (1965), to contend that Spain's submissions are sufficient to establish probable cause in a tax evasion case. (Gov't's Extradition Mem. at 16-18; Gov't's Reply at 14-17.) The Supreme Court in *Jaben* held that an Internal Revenue Service agent's affidavit sufficed to establish probable cause that the suspect committed tax evasion. *Id.* But the affidavit deemed sufficient in *Jaben* included more information than Spain's submissions. The *Jaben* affidavit stated that the agent conducted an investigation of the suspect's income tax liability by examining his tax returns, by interviewing third-parties with whom he did business or who had knowledge of his financial condition, and by consulting records reflecting his income. *Id.* at 221-22. In addition, the affidavit stated that, based on the investigation, the agent had personal knowledge of the suspect's tax evasion. *Id.* at 222. By contrast, while Spain's audits generally describe an investigation, they fail to identify an individual with personal knowledge that the investigation of Lanzani resulted in a finding of tax evasion or fraud.[15] Without this information, the Court

---

[15] A person's name appears beneath the title, "actuaries" at the top of each audit, but it is unclear whether this identifies the individual who performed the audits. (Second Supplemental FEP at 50, 55.)

1  cannot accord weight to the audits in its probable cause
2  determination.

3      In light of the deficiencies in the materials offered in support
4  of extradition, this Court finds a lack of competent evidence
5  demonstrating that there is reasonable ground to believe Lanzani is
6  guilty of the alleged crime.[16]

7

8  **IV.    Conclusion**

9      For the reasons discussed above, the Court DENIES WITHOUT
10 PREJUDICE Spain's request for a certification that Massimiliano
11 Lanzani is subject to extradition under 18 U.S.C. § 3184 and the
12 applicable treaty. IT IS ORDERED that the Order of Detention be
13 VACATED and that Massimiliano Lanzani be discharged from custody.

14

15 DATED: February 18, 2010

16

17 _____
18 Marc L. Goldman
   United States Magistrate Judge

19

20

21

22

23

24

25

26

27     [16] This is not to say that the Court would not have found probable
   cause had the conclusions regarding Lanzani's involvement in the
28 alleged VAT fraud been supported by competent evidence.

19